Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/24/2018 09:09 AM CDT

State of Nebraska, appellee, v.
Sydney L. Thieszen, appellant.
___ N.W.2d ___

Filed June 1, 2018.    No. S-17-539.

1. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Sentences: Evidence.** A sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence.
4. **Sentences.** The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.
5. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.
6. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

7. ____. Where a defendant was under the age of 18 when he or she committed a Class IA felony, Neb. Rev. Stat. § 28-105.02 (Reissue 2016) dictates that the sentencing judge must also consider mitigating factors, such as the defendant's (1) age at the time of the offense, (2) impetuosity, (3) family and community environment, and (4) ability to appreciate risks and consequences of the conduct, as well as (5) the outcome of a comprehensive mental health evaluation of the defendant conducted by an adolescent mental health professional licensed in Nebraska.

Appeal from the District Court for York County: James C. Stecker, Judge. Affirmed.

Jeffery A. Pickens, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Vaughan, District Judge.

Cassel, J.

## I. INTRODUCTION

A court sentenced Sydney L. Thieszen to life imprisonment for a murder he committed at age 14. Pursuant to *Miller v. Alabama*,[1] Thieszen obtained postconviction relief. The court resentenced Thieszen to 70 years' to life imprisonment. Because we find no abuse of discretion by the court, we affirm Thieszen's sentence.

## II. BACKGROUND

### 1. Crime and Direct Appeal

The facts and circumstances pertaining to Thieszen's crimes are set out in greater detail in our decision resolving his direct appeal.[2] In 1987, 14-year-old Thieszen shot and killed

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[2] See *State v. Thieszen*, 232 Neb. 952, 442 N.W.2d 887 (1989).

his 12-year-old sister, Sacha L. Thieszen. The State charged Thieszen with first degree murder and use of a firearm in the commission of a felony. Pursuant to a plea bargain, Thieszen pled guilty to second degree murder and the use of a firearm charge. In 1988, the district court imposed a sentence of life imprisonment for second degree murder and a consecutive sentence of 80 to 240 months' imprisonment for the firearm conviction.

On appeal, Thieszen claimed that the district court abused its discretion in refusing to transfer his case to juvenile court and in imposing an excessive sentence on the firearm charge. We disagreed. We recognized that there was evidence Thieszen could possibly be successfully rehabilitated during the approximately 4 years that the juvenile court maintained jurisdiction over him, but that the record also supported the court's findings that the crime was violent and that Thieszen may require treatment beyond the age of majority.[3] We noted that the sentence for the firearm conviction was within the statutory limits, and we could not say that the court abused its discretion in imposing it.[4]

## 2. FIRST POSTCONVICTION
### AND RETRIAL

In 1994, Thieszen filed a motion for postconviction relief, alleging that the operative information was defective because it failed to allege he acted with malice. The district court sustained the motion and vacated Thieszen's convictions.

The State then filed a second amended information which charged Thieszen with first degree murder and use of a firearm to commit a felony. A jury convicted Thieszen of the charges. The court again imposed sentences of life imprisonment for the murder conviction and a consecutive term of 80 to 240 months' imprisonment for the use of a firearm conviction.

[3] See *id.*

[4] See *id.*

### 3. SECOND POSTCONVICTION

#### (a) Initial Proceedings

In 2013, Thieszen filed a motion for postconviction relief pursuant to the decision in *Miller*.[5] The district court vacated Thieszen's life sentence, and the State appealed. We affirmed the judgment and remanded the cause for resentencing.[6]

#### (b) Mitigation Hearing

In March 2017, the district court received extensive evidence during a mitigation hearing.

Thieszen was born into an abusive environment. His natural mother was an alcoholic. On one occasion while she was intoxicated, she tried to burn Thieszen's eyes out with a lighter. She stomped on him at one time. When Thieszen was 2 or 3 years old, she threw him in a swimming pool. She tried to run his hand through a meat grinder. Thieszen's natural mother also smashed his toys as punishment and locked him in closets. When Thieszen was approximately age 4, he was removed from his natural mother's custody due to abuse and neglect.

After multiple foster care placements, Thieszen was placed with Edwin and Joyce Thieszen. Edwin and Joyce adopted Thieszen when he was 9 years old. At that time, Edwin and Joyce had three biological children and two other adopted children. Initially, Thieszen wanted to keep his distance from the family. But after approximately 1 year, he became very lovable and outgoing.

Although Edwin and Joyce offered a stable and structured environment, it may not have been a nurturing one. A doctor who evaluated Thieszen in connection with the adoption process expressed some reservation that the family's strong religious beliefs may be too restrictive for a child with Thieszen's background. Edwin and Joyce believed in corporal punishment

---

[5] *Miller v. Alabama, supra* note 1.

[6] See *State v. Thieszen*, 295 Neb. 293, 887 N.W.2d 871 (2016).

for rule violations. Edwin testified that he spanked the children when no other punishment worked and that he used his hand, a belt, a hose, or "whatever was handy."

When Thieszen was 12 years old, there was "a sudden drastic change in his behavior." His report cards reflected much lower grades, he ceased performing his chores properly, and he began shooting holes in the family's buildings and machinery. In January 1986, Thieszen began seeing Sandra Kroeker, a counselor, due to concerns about his poor grades and dishonesty. Kroeker felt that there was a great correlation between Thieszen's adolescent behavior and the abusive relationship Thieszen had with his natural mother. Kroeker diagnosed Thieszen with a conduct disorder. She testified that Thieszen was immature in his ability to formulate and maintain relationships, to express himself, to engage in effective decisionmaking, and to control impulses.

In December 1986, the family learned that Thieszen had been sexually molesting one of the family's foster children. After that point, Thieszen did not feel loved or wanted by his family. And he felt ostracized at school because the children there knew of his sexual assault on his foster sister.

There was also evidence of voyeuristic behavior. One of Thieszen's sisters testified that she noticed him watching her as she sunbathed. He pried open the doorjamb on the bathroom and would consistently be outside the bathroom door while she was showering or changing. At one point, Thieszen entered her bedroom during the middle of the night and lifted her bed covers.

By the time Thieszen was 13 or 14 years old, he did not have a good relationship with Joyce. He did not feel comfortable discussing issues with her. One of Thieszen's classmates testified that Thieszen often spoke about killing Joyce.

On the day of the murder, Thieszen wanted to run away from home because he knew he was going to be punished for a wrongdoing. When Sacha tried to stop Thieszen, he hit her with a wooden rod, which caused bleeding. Sacha ran up

the stairs to the bathroom, and as she was leaning over the sink, Thieszen shot her in the back of the head. He put her body in the bathtub and shot her twice more. Thieszen then took the family's van and left. He was apprehended in Kansas days later.

The court received the testimony of two psychiatrists that had been offered in connection with Thieszen's request to transfer his criminal case to juvenile court. One psychiatrist opined that Thieszen was competent to stand trial and that he was sane at the time of the offense. He found significance in the type of abuse that Thieszen had experienced as a very small child and the number of foster homes that he had been in prior to adoption. He testified that Thieszen had a conduct disorder, meaning that he displayed behavior that was not socially acceptable. The other psychiatrist, who interviewed Thieszen in December 1987, testified that Thieszen was not psychotic and was of average to slightly above-average intelligence.

Dr. Kayla Pope, a board-certified child and adolescent psychiatrist, testified at the mitigation hearing. She testified that neuroscience research demonstrated that adolescent brains were different from adult brains. Adolescent brains were in "developmental transition" and were "characterized by novelty seeking, risk taking, poor judgment and increased submission to peer pressure." Pope explained that the prefrontal cortex, which was the last part of the brain to develop, was the part of the brain that overrides impulsive behavior and allows the weighing of the risks and benefits of the decisions one makes. Pope testified that there are significant differences between the brains of a 14-year-old and a 17-year-old. According to Pope, adolescents "are thinking in the moment" and lack the ability to see the long-term consequences of their actions.

Pope testified that high levels of stress can impact brain development. Early trauma would impair a child's developmental process. According to Pope, abuse by Thieszen's natural mother would interfere with the formation of a secure

attachment and would make Thieszen "untrusting" and "emotionally and behaviorally very disregulated not knowing how to respond to his environment." Pope testified that Thieszen's early trauma and multiple placements in foster care affected "how he would see the world and how he would respond to the world." And due to Thieszen's experience of being abused by his natural mother, Pope testified that corporal punishment would be very inappropriate and would likely bring up prior trauma and "make [Thieszen] more reactive as opposed to helping him calm down and think through the situation."

Pope reported that there was ample evidence that Thieszen was impetuous beyond what was normal for his chronological age. She testified that Thieszen was very immature, impulsive, and unable to calm himself at the time of the murder. Pope believed Thieszen was behaving in an impulsive way at the time of the murder and that he did not appreciate the consequences of what he was doing. She reported that Thieszen "struggled to modify his behavior in light of the consequences he faced." She noted that Edwin stated Thieszen would repeatedly misbehave and would say that he did not know why he did the things he did. As to Thieszen's intellectual capacity, Pope testified that he had a very high IQ. But she explained that intelligence is the ability to know things and to figure things out; it is not a marker for development or maturity.

Pope performed a comprehensive mental health evaluation. With regard to Thieszen's prenatal history, Pope had concern that his natural mother may have used drugs and alcohol while pregnant, which would impact Thieszen's brain development and behavior. She testified that Thieszen had no significant medical history and no substance abuse history prior to the murder.

Pope testified that Thieszen had many infractions during his first few years in prison, but that there was a "precipitous drop" in those infractions as he aged. She saw no evidence that Thieszen engaged in aggression or violent sexual

behavior while incarcerated. Pope testified that Thieszen did not meet criteria for any mental health issue. She did not believe Thieszen had an antisocial personality disorder, stating that there was no evidence of any antisocial behavior in the past 30 years. Pope testified that Thieszen had earned his diploma through the GED program, had taken additional coursework, and had been helping other inmates with their academic pursuits. Although there was evidence that Thieszen had engaged in substance abuse while in prison, his last infraction for it was in 2000. Pope testified that Thieszen had over 200 misconduct reports, but that many were for minor violations, such as tattooing activities or having items not permitted in his cell. Records showed that as of January 18, 2017, Thieszen had only four misconduct reports in the previous 5 years. Of those reports, the most serious offense was possessing or receiving unauthorized articles, for which Thieszen received 7 days of room restriction.

Pope testified that Thieszen had formed several significant relationships that he had kept for several years. This demonstrated his ability to form a support network and to cultivate relationships that would help sustain him in the community. And Pope testified that it was remarkable Thieszen had such ability, because he had difficulty forming attachments early in development, and that his ability to form such relationships now is an indication of his emotional maturity. Pope testified that Thieszen expressed remorse for the crime.

Dr. Kirk Newring performed a psychological evaluation of Thieszen. On a diagnostic tool to assess violence risk and psychopathy, Thieszen scored a 12, which was higher than the community average of 6, but lower than the typical inmate score of 22. Newring testified that individuals with scores below 20 typically are not considered psychopathic. Newring administered a personality inventory, which did not reveal any major mental health problems. A tool to measure intelligence showed that Thieszen had an average to above-average IQ. Based on a violence risk assessment, Newring placed Thieszen

at a low risk for future acts of violence. A violence risk assessment tool showed that Thieszen "had some protective factors present, which is predictive of a favorable response to community transition." Those factors were intelligence, empathy, coping skills, and self-control.

Newring's diagnostic impressions were adjustment disorder with anxiety and antisocial personality disorder. Newring explained that Thieszen met the criteria for a diagnosis of antisocial personality disorder but cautioned that Thieszen had not shown any of that criteria in the last decade.

Newring did not administer any sex offender assessment tools because Thieszen, from the age of 18, had no sex-related misconduct reports or charges. According to Newring, Thieszen reported engaging in physical intimacies with female staff members over the course of his incarceration. Newring testified that those relationships would be potentially unhealthy if they were still occurring, but that Thieszen described them as "historical."

In 2014, Newring administered a self-report measure to assess the likelihood of substance abuse dependence. Based on the testing, Newring had concerns that Thieszen would meet criteria for cannabis use disorder.

Newring testified that Thieszen expressed remorse, regret, and sorrow for his crime. According to Newring, Thieszen "was likely in a very emotionally aroused situation and not able to do rational, cognitive thinking that we would expect to see in a cold logic situation." Newring explained that an emotionally aroused 14-year-old is different from a coldly logical 14-year-old and that a 14-year-old is much different from an 18-year-old. Newring asked Thieszen what, if anything, would he change, and Thieszen answered that he would have told the judge he did not want to be adopted by Edwin and Joyce.

A corrections officer at the prison who sees Thieszen on nearly a daily basis testified that Thieszen was "[p]robably" a good inmate. According to the officer, Thieszen did not cause trouble and was respectful to corrections officers and other

inmates. The officer further testified that Thieszen "just always does everything he's supposed to do" and that "[i]f you tell him to do something, he does it." According to the officer, Thieszen knits, crochets, exercises, and paints. He testified that Thieszen has many visitors. Five individuals wrote letters in strong support of Thieszen. A few of those individuals attached pictures of Thieszen's artwork and craftwork.

### (c) Resentencing

At the time of resentencing, Thieszen was 44 years old and had been incarcerated since 1987. Before imposing a sentence, the court addressed the factors set forth in Neb. Rev. Stat. § 28-105.02(2) (Reissue 2016). The court sentenced Thieszen to 70 years' to life imprisonment for first degree murder, to be served consecutively to the sentence he was currently serving of 80 to 240 months' imprisonment for the firearm conviction.

Thieszen filed a timely appeal.

## III. ASSIGNMENTS OF ERROR

Thieszen assigns, reordered, that the district court abused its discretion in (1) failing to strike certain letters from the presentence report, (2) allowing improper victim impact testimony at the sentencing hearing, (3) imposing an excessive sentence, (4) imposing a de facto sentence of life imprisonment without parole in the absence of a finding of irreparable corruption, and (5) imposing a disproportionate sentence upon him.

## IV. STANDARD OF REVIEW

[1,2] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[7] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[8]

---

[7] *State v. Russell*, 299 Neb. 483, 908 N.W.2d 669 (2018).

[8] *Id.*

## V. ANALYSIS

### 1. LETTERS IN PRESENTENCE REPORT

During the resentencing hearing, Thieszen's counsel asked that a number of letters in the presentence report be stricken. He did not believe it was appropriate for the court to receive letters from anonymous sources, and the court responded that it would not consider anonymous letters. Thieszen's counsel also requested that the court not consider specific information in letters that was baseless or inflammatory. The court stated that it would give such a letter "the weight and credibility that it's due and disregard any portions not supported by the record."

On appeal, Thieszen argues that the court abused its discretion by overruling his objections to letters which were submitted by anonymous sources, which contained baseless information, or which were intended to intimidate the judge and encourage the imposition of an inappropriate sentence. We disagree for two main reasons.

First, to some extent, the court granted the relief Thieszen requested. The court stated that it would not consider unsigned letters. The presentence report shows that the court struck a number of letters. With regard to letters to which Thieszen objected but which the court did not strike, the court stated that it would give each letter the weight and credibility it was due and that it would disregard portions that were not supported by the record.

[3] Second, a sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence.[9] We cannot say that the court abused its broad discretion in declining to strike all of the letters to which Thieszen objected.

---

[9] *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

## 2. Victim Impact Testimony

The State informed the court that one of Thieszen's sisters wished to read a letter to the court under Neb. Rev. Stat. § 81-1848 (Cum. Supp. 2016). Thieszen's counsel objected on the basis that the sister is not a "victim" under the statute. But the court stated that it would "give her an opportunity to read her letter as an immediate family member."

A statute sets forth rights for victims of crimes.[10] Such a victim has the right to submit a written impact statement at sentencing or to read his or her impact statement at sentencing.[11] But the statute gives such rights to "victims" as defined by Neb. Rev. Stat. § 29-119 (Reissue 2016). Under § 29-119(2)(b), a victim in the case of a homicide is "the nearest surviving relative under the law as provided by section 30-2303 but does not include the alleged perpetrator of the homicide."

Thieszen contends that the court abused its discretion in allowing improper victim impact testimony. Because Thieszen's parents are alive, Thieszen contends that they, but not his sister, had the right to read their impact statements at sentencing.

We rejected a similar challenge in *State v. Galindo*.[12] In that case, the defendant objected to victim impact statements on the ground that not all of the family representatives qualified as a "nearest surviving relative" under § 29-119. The sentencing court overruled the objection, and we found no error. We stated: "The definition of 'victim' upon which [the defendant] relies merely provides for a baseline right, under the [Nebraska Crime Victim's Reparations Act], to give a victim impact statement. The [act] does not seek to limit the sentencing court's traditional discretion to consider evidence from a variety of sources."[13] Because we continue to believe this

---

[10] See § 81-1848.

[11] See § 81-1848(1)(d)(vii).

[12] *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009).

[13] *Id.* at 670, 774 N.W.2d at 245.

reasoning is sound, we decline Thieszen's invitation to overrule that aspect of *Galindo*.

The court did not abuse its discretion in allowing an oral statement from Thieszen's sister. The State advised the court that the victims as defined in § 29-119—i.e., Edwin and Joyce—"are elderly, they live out of state and for various reasons don't want to participate in the process." It was not untenable for the court to allow the victims' daughter to be heard instead. This assignment of error lacks merit.

### 3. EXCESSIVENESS OF SENTENCE

Thieszen's primary complaint on appeal is that his sentence is excessive for various reasons. The court imposed a sentence of 70 years' to life imprisonment. The sentence is within the statutory limits of 40 years' to life imprisonment.[14] But Thieszen contends that the court abused its discretion in imposing the sentence.

Thieszen begins by comparing his sentence to that imposed in *State v. Jackson*.[15] In that case, the victim died of multiple gunshot wounds. The State filed identical informations against the defendant and two others, charging each with first degree murder and use of a deadly weapon during the commission of a felony. At the time of the murder, the defendant was nearly 18 years old. A jury found the defendant guilty of murder but not guilty of the weapon charge, and the court imposed a sentence of life imprisonment. Because the defendant was under 18 years old at the time of the murder, he was later resentenced to 60 to 80 years' imprisonment. Thieszen points out that he was younger than the defendant in *Jackson*, but that the defendant in *Jackson* received a lesser sentence.

[4] The lesser sentence imposed in *Jackson* does not persuade us that Thieszen's sentence constitutes an abuse of discretion. Significantly, there were questions about the defendant's

---

[14] See § 28-105.02(1).

[15] *State v. Jackson*, 297 Neb. 22, 899 N.W.2d 215 (2017).

level of participation in *Jackson*. Here, there is no dispute that Thieszen murdered Sacha. But more importantly, we do not "'color match'" sentences.[16] It would be virtually impossible to find two murder cases which are the same in all respects.[17] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[18] The fact that a different offender with a different background received a lesser sentence for a crime committed under different circumstances does not mean that Thieszen's sentence was excessive.

[5-7] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[19] In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[20] Because Thieszen was under the age of 18 when he committed a Class IA felony, § 28-105.02 dictates that the sentencing judge must also consider mitigating factors, such as the defendant's (1) age at the time of the offense, (2) impetuosity, (3) family and community environment, and (4) ability to appreciate risks and consequences of the conduct, as well as (5) the outcome

---

[16] See *State v. Ellis*, 281 Neb. 571, 613, 799 N.W.2d 267, 302 (2011).

[17] *Id.*

[18] *State v. Castaneda*, 295 Neb. 547, 889 N.W.2d 87 (2017), *cert. denied* ___ U.S. ___, 138 S. Ct. 83, 199 L. Ed. 2d 54.

[19] *State v. Russell, supra* note 7.

[20] *Id.*

of a comprehensive mental health evaluation of the defendant conducted by an adolescent mental health professional licensed in Nebraska.[21]

The district court considered the pertinent sentencing factors. It recognized that Thieszen was 14 years old at the time of the offense and that at the time of resentencing, he was divorced and had employment through "prison industries." In considering factors under § 28-105.02(2), the court acknowledged that evaluations showed Thieszen was impetuous and immature at the time of the offense. However, the court noted that Thieszen purchased shells prior to the crime and that because his gun had been taken away from him, there "was no valid reason for [him] to purchase or possess shells except to carry out previous threats to [his] family." The court observed that Thieszen's natural mother was abusive and that he was raised in an abusive environment until age 4. The court stated that Edwin and Joyce raised Thieszen in a structured environment, that they disciplined Thieszen to correct his behavior, but that Thieszen did not modify his behavior after being caught doing something wrong. The court noted that Thieszen had above-average intellectual capacity. It recognized that Thieszen had never been hospitalized for any mental health reason and that Newring indicated Thieszen was well adjusted. We cannot say that the court abused its discretion in its assessment of the factors.

We are cognizant of factors militating against Thieszen's culpability for the crime. According to Pope, Thieszen's traumatic early childhood likely influenced his emotional and cognitive development. There was evidence that Thieszen was struggling mentally and emotionally prior to the murder and that the only treatment provided was occasional therapy sessions. According to Pope, "these factors would have interfered with [Thieszen's] ability to make rational decisions, appropriately consider risks and consequences, and to regulate his

---

[21] See *id.*

behavior and impulses above and beyond the limitations that are associated with adolescence." Pope observed that over time, Thieszen had taken on the roles of teacher and advisor to other inmates and to the social network he had formed outside of prison. These factors support the imposition of a minimum sentence that is less than life imprisonment. The court, by setting the minimum sentence at 70 years, imposed such a sentence.

Thieszen also claims that his sentence amounted to a de facto life sentence and that such a sentence was disproportionate to the offense. According to Thieszen, his sentence of 70 years' to life imprisonment means he will not be parole eligible until age 53 and, if paroled, he will be on parole for the rest of his life. But the sentence provides Thieszen with a "meaningful and realistic opportunity to obtain release."[22] We have rejected similar claims that a lengthy term-of-years sentence was a de facto sentence of life imprisonment,[23] and we see no reason to revisit that conclusion here.

## VI. CONCLUSION

We conclude that the district court did not abuse its discretion in overruling Thieszen's objections to letters in the presentence report, in allowing Thieszen's sister to read her victim impact statement at the sentencing hearing, or in imposing the sentence. We therefore affirm Thieszen's murder sentence of 70 years' to life imprisonment.

AFFIRMED.

---

[22] *State v. Smith*, 295 Neb. 957, 979, 892 N.W.2d 52, 66 (2017), *cert. denied* ___ U.S. ___, 138 S. Ct. 315, 199 L. Ed. 2d 208.

[23] See, *State v. Russell, supra* note 7; *State v. Smith, supra* note 22.